Arthur E. Blyn, J.
Here is a ease which clamors for the application of the newly popular word in the legal lexicon— unconscionable. There are those who say that this word is now, a word of art because it has been used in the Uniform Commercial Code. It is however, an ancient and honorable word and cannot be confined by appropriation on the part of the authors of the Uniform Commercial Code.
The case to which the court is addressing itself is not an isolated incident. What is involved is a widespread practice. It deals with the use of a credit card, and in our credit economy represents an important part of the lives of many people.
The plaintiff, American Express Company (hereinafter referred to as American) sues defendant Arthur Geller (hereinafter referred to as Geller), for the sum of $6,693.34.
Th defendant Geller sought employment as a salesman with Museum Print Editions, Inc. (hereinafter referred to as Museum). His application was accepted, and part of the many papers he had to sign to commence employment was an “ Application for Supplementary Card ” (subtitled “ Company Account [Combined] Billing”). There is some question as to whether he was aware of the significance of this paper. This application was directed to, and was on the form supplied by American. The application called for the name and home address of Geller; *285 the name and address of his employer Museum; the signature of Geller (as the individual for whom the supplementary card was requested); and the signature of the company officers (authorizing issuance of the supplementary card).
The application form contained the following language: “ The undersigned individual and company join in this application and assume joint and severally liability for all charges incurred prior to return of Card to American Express Company. The applicants agree to be bound by the terms and conditions accompanying the card, if this application is accepted and a Card issued.”
Geller, as part of his duties as a salesman, was required to travel extensively, sometimes alone, and at other times with one of his superiors. The card was issued to him, so that during such travels, Geller could charge hotel-motel expenses, travel tickets, meals, etc., through American to Museum.
The card was used for such purposes, and as testified to by Geller, only for business expenses incurred on behalf of his employer, Museum. This was not disputed by American. Geller further testified that he had never received any bills from American during his employment by Museum, and after he left the employ of Museum. He was never notified of the delinquent condition of Museum’s account with American and thus never had a chance to refuse to use the card or to contact Museum with a view of seeing to it that it pay its obligation. Museum filed a petition for an arrangement under chapter 11 ■of the Bankruptcy Act on December 7, 1971. A creditors’ committee was selected (which incidentally included American). American commenced this action against Geller on December 7, 1972.
Museum, as have many other corporations, apparently found that it was most convenient for it to have employees use a credit card for its business purposes. It thus eliminated the use or abuse by an employee submitting what have in the past frequently been referred to as “ swindle sheets ’ ’. American, on its part was most happy with this arrangement, adding as it admits, to the volume of its business and the size of its profits. American further benefited, as it very bluntly puts it, when it stated in its memorandum of law: “ Corporations, particularly small corporations with limited liability and ease of evolution and dissolution, are particularly unstable. The experience of credit companies with individuals, on the other hand, is that in general terms, they respond well and consistently to *286 obligations undertaken. They are, in other words, an important and substantial .source of payments for the company,” Translated, this means that American would not issue credit card status to such corporations, but would do so if it had a sacrificial Iamb on the altar so far as liability was concerned.
This would not in and of itself be objectionable. Principals of such corporations could well assume such individual liability in order to secure credit status for their corporations. This is done many times in similar circumstances. Reference will be made at a later point in connection with this aspect and cases cited by American.
What is objectionable is that an individual, who is an ordinary employee, is involved in such a supplementary card arrangement as part of his employment.
American goes on to state in its memorandum of law: “ To hold that the clear language of these contracts is in any way unenforceable would jeopardize thousands upon thousands of contracts, and hundred of thousands of dollars worth of accounts.” To this G-eller replies: “In closing, I would like to make this statement. American Express states in their brief that the language of their contract is clear and that any change in them would jeopardize thousand upon thousands of contracts. I wonder how many individuals jeopardize their future, such as myself, by unknowingly entering into this agreement with American Express Company.”
American further cites language interpreting contract agreements and posturing the familiar pleas that: ‘6 the signer of an instrument expressive of a jurai act, is conclusively bound thereby.” (Mencher v. Weiss, 306 N. Y. 1, 4 [1953]); the “ intention ” of the parties must be determined by the language of their agreement; “The relevant contractual intent is that expressed in the contract, even though it may not accord with the subjective intent of the parties.” (Peripheral Equip. v. Farrington Mfg. Co., 29 A D 2d 11, 13 [1967]); it is entirely possible for an agent (referring to Greller) to become liable on a contract contrary to his actual intention, citing an Oklahoma case, McConnell v. Holderman (24 Okla. 129 [1909]); and courts should not rewrite the terms of a simple contract after the fact. (Laba v. Carrey, 29 N Y 2d 302 [1971].)
American then, not quite willing to rest on these time honored general principles, cites several cases dealing directly with credit cards of the type which is the subject of this litigation. As a matter of fact, three of the four eases cited actually involved American as plaintiff (then known as Clark Winter, at a time *287 when American was an unincorporated joint stock association and sued in the name of its treasurer). In each of three of the four cases cited (only two of which were reported cases) however, and of utmost significance to this court, the person sought to he held personally liable (and who was held liable by the court in those cases) under the joint and several language of the application card was the president of the corporate employer member of American (Clark Winter), and who had signed the card both as an officer and individually. The importance of this distinction is that a principal of a corporation is in a different position than one who applies for employment with such corporation and is an ordinary employee. The defendant applied for employment with Museum and was asked as part of the employment arrangements to sign various forms including the 61 Application for Supplementary Card.” He was not in the position of a principal, and was certainly placed in an extremely unequal bargaining position very much akin to the unequal bargaining position of a tenant seeking to rent an apartment. One might argue that when Geller received the credit card issued by American, he did not have to use it. That would be the equivalent of saying that the tenant, after securing occupancy of an apartment, need not pay rent. Both such actions have disastrous possibilities. Loss of job or loss of apartment.
American takes a firm and confident position on that old 6 8 Bock of Gibraltar” — stare decisis. Stare decisis can also mean rigor mortis in today’s complex world. Mr. Justice Cabbozo believed in the living law. He wrote in Ms essay on 88 The meaning of Justice 88 Law accepts as the pattern of its justice the morality of the community whose conduct it assumes to regulate. In saying this, we are not to blind ourselves to the truth that uncertainty is far from banished. Morality is not merely different in different communities. Its level is not the same for all the component groups within the same community. A choice must still be made between one group standard and another. We have still to face the problem, at which one of these levels does the social pressure become strong enough to convert the moral norm into a jurai one? ” TMs language of Caedozo could also be read to mean that when a once jurai relationship becomes unconscionaile it should not be enforced by the courts.
In relationships between unequals the courts should strive 'to protect the weak member in dealings which are sought to be interpreted in past jurai terms.
*288 This court believes that when the application of past jurai meanings (read here stare decisis) to contractual dealings' between unequal parties results in an outcome which outrages the conscience, the court should refuse to enforce the terms of such a contract; should break the paralysis of stare decisis. This court’s conscience is outraged. This is a case where the “ moral norm ” demands the death of a jurai status.
. Judgment is awarded to defendant, without costs or disbursements.